JDB:EAG/JDG
F.#2005R00248

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -              No. 08 CR 240 (S-1) (NG)

THOMAS GIOELI, et al.,

        Defendants.

- - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTION FOR PERMANENT ORDERS OF DETENTION AS TO
DEFENDANTS THOMAS GIOELI, DINO CALABRO, MICHAEL CATAPANO, JOSEPH
COMPETIELLO, JOHN CAPOLINO, JOSEPH DIGORGA, AND ORLANDO SPADO

                                  BENTON J. CAMPBELL
                                  United States Attorney
                                  Eastern District of New York
                                  271 Cadman Plaza East
                                  Brooklyn, New York  11201

Elizabeth A. Geddes
James D. Gatta
Assistant United States Attorneys
    (Of Counsel)

**Table of Contents**

Preliminary Statement . . . . . . . . . . . . . . . . . . 1

Proffered Facts . . . . . . . . . . . . . . . . . . . . . 2

    I.   Overview of the Investigation . . . . . . . . . . . 3

    II.  The Defendants Are Members or Associates of the
        Colombo Family . . . . . . . . . . . . . . . . . . 5

    III. The Defendants Are Charged With Crimes of Violence
        and/or Controlled Substance Offenses . . . . . . . 5

        A.   Murder of Frank Marasa . . . . . . . . . . . 5

        B.   Murders of Michael Imbergamo and
            John Minerva . . . . . . . . . . . . . . . . 6

        C.   Murder of Carlos Pagan . . . . . . . . . . . 7

        D.   Robbery of Furs by Mina . . . . . . . . . . . 7

        E.   Extortion and Extortion Conspiracy . . . . . 8

            1.   Cujini Due Pizzeria . . . . . . . . . . 8

            2.   Beauty by Andre . . . . . . . . . . . 10

            3.   John Doe #2 . . . . . . . . . . . . . 10

        F.   Hobbs Act Robbery Conspiracy . . . . . . . 11

        G.   Marijuana Distribution . . . . . . . . . . 12

        H.   Cocaine Distribution . . . . . . . . . . . 13

Analysis . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.   Legal Standard . . . . . . . . . . . . . . . . . 16

        A.   Bail Reform Act . . . . . . . . . . . . . . 16

        B.   Organized Crime Defendants . . . . . . . . 17

            1.   Organized Crime Leaders Are Dangers
               to the Community . . . . . . . . . . . 18

2.   Organized Crime Defendants Are Likely to
     Commit Crimes if Released on Bail  . . .  21

3.   Elaborate Bail Packages Are Insufficient
     to Protect the Community Against Violent
     Organized Crime Defendants . . . . . .  23

II.  The Defendants Should Be Detained  . . . . . . .  25

A.   The Defendants Are a Danger to the Community   25

1.   Nature and Circumstances of the Crimes
     Charged . . . . . . . . . . . . . . . .  25

2.   History and Characteristics of the
     Defendants  . . . . . . . . . . . . . .  27

     a.   Thomas Gioeli  . . . . . . . . .  27

     b.   Dino Calabro  . . . . . . . . .  27

     c.   Michael Catapano  . . . . . . .  28

     d.   Joseph Competiello  . . . . . .  28

     e.   John Capolino  . . . . . . . . .  29

     f.   Joseph DiGorga  . . . . . . . .  30

     g.   Orlando Spado . . . . . . . . .  30

3.   Seriousness of Danger Posed By the
     Defendants' Release  . . . . . . . . .  31

4.   Evidence of the Defendant's Guilt . . . .  31

B.   The Defendants Constitute a Risk of Flight . .  32

Conclusion . . . . . . . . . . . . . . . . . . . . . . .  34

**<u>Preliminary Statement</u>**

On May 29, 2008, a grand jury in this District returned a sealed seventeen count Superseding Indictment ("Indictment") charging twelve defendants – including defendants Thomas Gioeli, Dino Calabro, Michael Catapano, Joseph Competiello, John Capolino, Joseph DiGorga, and Orlando Spado – variously with racketeering conspiracy, extortion, Hobbs Act robbery, gun possession and narcotics trafficking.[1]  The charged racketeering conspiracy predicate acts include, among others, four acts of murder, murder conspiracy, felony murder, robbery and extortion.

The Indictment identifies defendants Gioeli, Calabro, Catapano, Competiello, Capolino, DiGorga, Spado – all arrested this morning – and others as members or associates of the Colombo organized crime family of La Cosa Nostra (the "Colombo family"), a violent criminal enterprise that engages in a litany of crimes, including, among others, murder, robbery, extortion, and obstruction of justice.  The Indictment also identifies Gioeli as the acting boss or "street boss" of the Colombo family and Calabro and Catapano as captains or acting captains in the crime family.

The government hereby moves for a permanent order of detention with respect to defendants Gioeli, Calabro, Catapano,

---

[1]     A chart summarizing the charges set forth in the Superseding Indictment is attached hereto.  The original Indictment charged defendant Christopher Curanovic with Hobbs Act robbery conspiracy and firearms possession.

Competiello, Capolino, DiGorga, and Spado.[2]  These seven
defendants pose a danger to the community and a risk of flight
and thus should be detained pending trial.

### Proffered Facts

The government proffers the following facts concerning
the charges at issue and pretrial detention.[3]  See United States
v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (the
government is entitled to proceed by proffer in a detention
hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir.

---

[2]     In light of the fact that defendants John "Sonny"
Franzese and Nicholas Bova are presently incarcerated (Franzese
for violating the terms of his supervised release following his
conviction in the Eastern District of New York and Bova for New
York State charges), we do not move for permanent orders of
detention against them at this time.  The government reserves the
right, however, to move for permanent orders of detention at the
time of their arraignment.  Moreover, the government makes this
motion without prejudice to making additional arguments in
support of the detention of any of the seven defendants whose
detention the government seeks in this motion, and without
prejudice to seeking a permanent order of detention against other
defendants indicted in this matter.

[3]     The proffer of facts set forth herein does not purport
to provide a complete statement of all facts and evidence of
which the government is aware or that it will seek to introduce
at trial.

2

1995) (same); <u>United States v. Martir</u>, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).[4]

The proffer includes a brief description of the following: (1) the government's investigation of the Colombo family and the defendants; (2) the defendants' association with, and positions in, the Colombo family; and (3) the defendants' involvement in the charged criminal activity, with particular attention to the charged crimes of violence.

## I.  Overview of the Investigation

The Indictment is the most recent result of a longstanding investigation by this Office, the Federal Bureau of Investigation, and other law enforcement agencies into the ongoing criminal activities of the Colombo family.  In those investigations, members and associates of the Colombo family have

---

[4]     As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination.  Most proceed on proffers.  <u>See</u> <u>United States v. LaFontaine</u>, 210 F.3d 125, 131 (2d Cir. 2000).  This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  <u>United States v. Acevedo-Ramos</u>, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in <u>LaFontaine</u>, 210 F.3d at 131).  Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  <u>Id.</u>

<u>United States v. Abuhamra</u>, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

3

agreed to cooperate with the government.  Those cooperating witnesses have advised that the Colombo family exists and that it is a violent criminal enterprise that engages in various crimes including, among others, murder, robbery and extortion, as well as crimes intended to obstruct justice.[5]

The present investigation is the product of a diverse array of investigative tools.  Notably, over the past three years, multiple cooperating witnesses have made hundreds of hours of recordings of many of the defendants discussing various of their criminal activities.  Additionally, numerous cooperating witnesses have provided historical information about the Colombo family which underlies charges brought in this case.  The investigation was also advanced by wiretap interceptions, telephone records, financial documents, forensic analysis and other physical and documentary evidence.

---

[5]     Convictions in recent years in this District of Colombo family members and associates include, among others:  (1) the December 2007 trial conviction of former Colombo acting boss Alphonse Persico and former Colombo acting underboss John "Jackie" DeRoss of murder in aid of racketeering and witness tampering regarding their participation in the murder of Colombo underboss William "Wild Bill" Cutolo, (2) the February 2006 trial conviction of Colombo associate Michael Spataro on racketeering charges in connection with the attempted murder of Colombo member Joseph Campanella, (3) the May 2004 trial conviction of Colombo member Vincent "Chickie" DeMartino and Colombo associate Giovanni Floridia on racketeering charges in connection with the Campanella attempted murder, and (4) the April 2008 conviction of Colombo member Frank "Chickie" Leto on racketeering charges.

## II.  The Defendants are Members or Associates of the Colombo Family

Defendants Gioeli, Calabro, Catapano, Competiello, Capolino, DiGorga, and Spado are members or associates of the Colombo family.  The government will establish these defendants' positions within the Colombo family through the testimony of cooperating witnesses and law enforcement witnesses, as well as surveillance evidence and physical and documentary evidence.

Defendants Gioeli, Calabro and Catapano each hold positions of authority within the Colombo family; Gioeli is currently the family's acting boss or "street boss," and Calabro and Catapano each presently hold the position of captain. Defendant Competiello is an inducted member of the Colombo family, and defendants Capolino, DiGorga and Spado, while not inducted members, are criminal associates of the Colombo family.

## III. The Defendants Are Charged With Crimes of Violence and/or Controlled Substance Offenses

Each of the defendants for whom the government seeks pretrial detention is charged with one or more crimes of violence.  The following are brief summaries of the facts underlying some of the charges against these defendants.

### A.  Murder of Frank Marasa

Defendants Gioeli, Calabro and Competiello are responsible for the 1991 murder of Frank Marasa, also known as "Chestnut."  Marasa was murdered in front of 8675 19th Avenue,

Brooklyn, New York on June 12, 1991.  On that date, Marasa was found by New York City Police Department officers laying shot in the street.  Marasa later died from the gun shot wounds.

Marasa was murdered in retaliation for his perceived involvement in the murder of Colombo family associate Ennab Awjab, also known as "OJ," on May 30, 1991.  Calabro, then a Colombo family associate, sought and obtained permission to kill Marasa from Gioeli, then a Colombo family soldier.  After obtaining Gioeli's permission, Calabro, Competiello and others carried out the murder, ambushing Marasa on the street.

B.  **Murder of Michael Imbergamo and John Minerva**

Defendants Gioeli and Calabro also participated in the murders of Michael Imbergamo and John Minerva on March 25, 1992. During the early 1990s, the Colombo family had split into two warring factions, one loyal to the then acting family boss Victor Orena and the other loyal to the then "official" boss of the family Carmine Persico.[6]  Gioeli and Calabro were members of the faction loyal to Persico.

On the evening of March 25, 1992, John Minerva, a soldier in the Orena faction, and Michael Imbergamo were killed as part of the Colombo family war.  Imbergamo was not the intended target, but was killed simply because he was with

---

[6]    Carmine Persico is currently serving a 130 year term of imprisonment on federal racketeering charges.

Minerva.  Both men were shot inside of a car parked in front of
the Broadway Café, located at 1129C Broadway in North Massapequa,
New York.  Multiple cooperating witnesses identify Gioeli and
Calabro as members of the hit teams who carried out the murders.[7]
Phone records confirm that defendants Gioeli and Calabro were in
contact shortly before they participated in the murders.

    **C.**    **Murder of Carlos Pagan**

       Defendant Calabro also participated in the felony
murder of Carlos Pagan on January 9, 1992, who Calabro and others
were attempting to rob.

       Carlos Pagan was attempting to deliver cash and food
stamps to a check cashing store, located on 65th Street in
Brooklyn, New York.  As Pagan neared the check cashing store, a
co-conspirator of Calabro started to spray Pagan with mace.
Pagan managed to obtain his weapon and started to shoot.  A
member of Calabro's robbery team then returned fire and killed
Pagan.

    **D.**    **Robbery of Furs by Mina**

       Defendants Gioeli, Calabro and Competiello also
participated in a violent robbery of a fur store, Furs by Mina,

---

      [7]    On April 20, 1994, Joseph Russo, Anthony Russo and
Joseph Montelone, Sr., were convicted following trial in the
Eastern District of New York for their separate roles in the
murders of Imbergamo and Minerva.

located at 408 Jericho Turnpike, in Syosset, New York, on
February 11, 1991.

　　　　　Gioeli, Calabro and another individual entered Furs by
Mina, posing as a father and two sons interested in purchasing a
fur for Valentine's Day.  Once inside the store, they drew guns
and then handcuffed and forced the owner and the owner's son to
the floor.  Competiello and others then filled garbage bags with
fur coats from the store and loaded the coats into vehicles that
were waiting outside.

　　　　**E.**　　**Extortion and Extortion Conspiracy**

　　　　　The Indictment also charges the defendants with their
involvement in numerous extortions, extortion conspiracies and
attempted extortions, both in substantive counts and as
racketeering predicate acts.

　　　　　**1.**　　**Cujini Due Pizzeria**

　　　　　In 2003, defendants Catapano and DiGorga extorted two
of the owners of Cujini Due Pizzeria, located in Albertson, New
York.  Defendant Angelo Giangrande – a criminal associate of the
Colombo family who jointly owned the pizzeria with two other
owners (who are brothers) – paid $30,000 to Catapano so he would
use his organized crime influence to coerce the two owners to
sell the business, allowing Giangrande to purchase it at a
discount and to reopen it under a new name.  Thereafter,
Catapano, DiGorga and defendant Franzese agreed to extort the

8

brothers, an agreement they admitted during consensual recordings
made by a cooperating witness in 2005.  During one recording,
Catapano explained to defendant Frank Campione how he was able to
get one brother to sell the pizzeria:  "I had abused him one day
in the fuckin' parking lot."  Later in the recording, Catapano
explained how he threatened the other brother by visiting him in
a hair salon the brother owned, while the brother was doing an
older woman's hair:  "When he seen me walk in he got so nervous
. . . Once I showed up in there then they fucking signed the
papers.  It was all over.  I says, well listen, if you don't want
me to come back, you better have your brother . . . I said, won't
come back unless you can do what gotta ask you to do.  Otherwise,
I gotta come back."

         In another consensual recording made by a cooperating
witness in 2005, DiGorga discussed the protection money that
Giangrande owed, noting that Giangrande was to pay Franzese $400
a week.  DiGorga stated:

>          I did my work . . . I made the deal . . . and
>          he [Giangrande] never gave him [Franzese] a
>          fucking dime. . . . I got him that joint, we
>          went in there, we went into that other guy's
>          beauty parlor and his fucking . . . mother
>          fainted. . . . and he never gave him a
>          fucking dime, gives him a slice of pizza,
>          cocksucker.

         Business records show that the two brothers sold the
pizzeria – which they bought with Giangrande for $525,000 in 2000

– to Giangrande and another individual for approximately $300,000 in 2003.  The pizzeria presently operates as Da-Angelo Pizzeria.

### 2.   **Beauty by Andre**

In 2005, defendant Catapano and others extorted a co-owner of a West Hollywood, California spa named Beauty by Andre. During consensual recordings made by a cooperating witness between March and May 2005, Catapano discussed forcing one of the spa's co-owners out of business in order to obtain payments from another representative of the spa.  Catapano and his co-conspirators discussed resorting to violence if necessary to further their goals.  For example, in March 2005, Catapano stated during a recorded conversation "[e]ven after we get fifty percent of the place and our money, give him a fucking beating anyway."

### 3.   **John Doe #2**

Between January 2003 and March 2006, defendants Catapano and Capolino collected payments on an extortionate loan extended to an individual ("John Doe #2") by Bonanno family soldier Mike "The Butcher" Virtuoso.[8]  John Doe #2 initially borrowed money from Virtuoso – whom he met through Capolino sometime in 2003, and under the terms of that loan paid "four points" on the loan – i.e., four percent interest per week and

---

[8]      Virtuoso pleaded guilty in August 2007 to racketeering conspiracy which included, as a predicate act, the extortionate loan extended to John Doe #2.  See United States v. Virtuoso, 06-CR-800 (SLT) (Docket No. 243).

10

over 200 percent interest per annum.  The loan to John Doe #2 was collected by Capolino, who collected an interest payment of "one point" from John Doe #2.  Capolino himself owed significant sums of money to Virtuoso.  As Capolino had difficulty making the monthly payments to Virtuoso, Catapano and Capolino collected the additional payments on John Doe #2's loan as a way to reduce Capolino's obligation to Virtuoso.

During a consensual recording made by a cooperating witness in 2005, Capolino discussed how Virtuoso had come to Capolino's home looking for a payment on Capolino's loan. Capolino, picking up a gun he had in his home, threatened that he would shoot Virtuoso if Virtuoso were to come to his house again. Capolino said, "Next time he comes here, alright?" as he held the gun and pulled back the hammer.

**F.    Hobbs Act Robbery Conspiracy**

Between January and May 2006, defendants Spado and Curanovic, with others, conspired to rob a narcotics dealer in Los Angeles, California.  Curanovic and a co-conspirator flew to Los Angeles on May 18, 2006, where they met with Spado and another co-conspirator at Spado's residence to discuss the planned robbery.  Spado told Curanovic that the residence had a million dollars in cash inside.  The next day, Curanovic and a co-conspirator drove to the residence in a rented Cadillac Escalade wearing tee-shirts and hats with the markings "DEA" on

them and with a fake search warrant Curanovic had created to use to attempt to gain entry.  Curanovic was carrying a firearm that Spado had provided to him for use during the robbery.

When they arrived at the residence, Curanovic and a co-conspirator identified themselves as law enforcement agents, and stated that they had a search warrant.  Once inside, Curanovic and a co-conspirator attempted to restrain a woman, and Curanovic pistol-whipped the woman using the firearm given to him by Spado. Curanovic and the co-conspirator later fled, and drove directly to the airport where they boarded a flight back to New York.  On or about July 26, 2006, during a meeting that was recorded by a cooperating witness, Curanovic admitted his and Spado's roles in the home invasion, including his use of a gun in the commission of the crime.

G.   **Marijuana Distribution**

Between July 2005 and July 2006, defendants Catapano and Nicholas Bova, another Colombo family associate, conspired to possess with the intent to distribute marijuana.  Consensually-recorded conversations, wiretap interceptions, the testimony of a cooperating witness, and law enforcement witnesses will establish that Catapano provided money to Bova, one of his associates, so that Bova could set up a business selling hydroponically-grown marijuana.  Consensual recordings made by a cooperating witness in 2005 reveal Catapano's involvement with the operation.  During

one conversation in August 2005, Catapano explained that he
advised Bova to keep the operation for "one year and then get rid
of it."  Catapano later said that Bova had told him that "it
should be ready to seed by the 30th . . . then he's got to dry it
out for at least four days."  In a later recorded conversation,
Catapano told Bova, "[l]et's do what you gotta do, get this thing
started, get it rolling and in about a year, you give it to
somebody and take a cut."

     Wiretap interceptions from a cellular telephone used by
Catapano in 2006 also reveal his discussions with Bova about
their marijuana growing operation.  In calls intercepted in April
2006, Bova – speaking in code – advised Catapano, among other
things, that the "computers" were in; the "brochures [were] still
wet"; and the "pamphlets" that had been printed needed to be
"cut" to send out to the "clients."  In a call intercepted in May
2006, Bova told Catapano that he should have a package for
Catapano that Friday.  Bova said that the "overhead" was $7,000
and that the "brochures were good," but that "office space" was a
problem.

    **H.**    **Cocaine Distribution**

     Between May and July 2006, defendants Catapano and
Spado conspired to conduct a drug deal involving more than 50
kilograms of cocaine.  In a series of recorded telephone
conversations in May 2006, Spado and a cooperating witness agreed

13

that Spado would obtain 50 kilograms of cocaine from his sources
in California and that the cooperating witness would arrange to
transport the cocaine back to New York with a specially-equipped
vehicle.  In one recorded conversation, Spado assured the
cooperating witness that "his friend . . . definitely wants to do
that with us" and that his friend would "begin with 50[,]" which
the cooperating witness understood to be 50 kilograms of cocaine.

After the cooperating witness informed Catapano about
Spado's offer, Catapano instructed the cooperating witness to
learn more about Spado's dealings, and noted that the Colombo
family would expect Spado to "kick up" some of his profits to the
family.  A few days later the cooperating witness and Spado met
to discuss the specifics of Spado's operation.

In June 2006, the cooperating witness, who was equipped
with a recording device, met with Catapano and informed him that
they – Catapano and the cooperating witness – would receive
$25,000 for providing Spado with the specially-equipped vehicle.
Catapano told the cooperating witness that they should give
$5,000 of the proceeds to defendant Franzese (without disclosing
the source of the money) and that they should split the remaining
$20,000 between them.  Catapano instructed the cooperating
witness to send the money to his sister's house, concealed
between photographs.

14

During June 2006, Spado and the cooperating witness met with two males in Los Angeles, California and discussed purchasing approximately 50 kilograms of cocaine from them.  At the end of June 2006, Spado told the cooperating witness that the two men had shown up at his residence with 20 kilograms of cocaine but that he had declined to store the drugs while they waited for a driver to arrive from New York.  When the cooperating witness called Spado back to tell him that a driver was ready to leave for Los Angeles, Spado informed him that the two men had already sold the cocaine.  The cooperating witness then instructed Spado to store the cocaine the next time the two men came to Spado's residence with drugs.

In July 2006, Spado once again informed the cooperating witness that he could obtain the 50 kilograms of cocaine from his sources.  In a recorded conversation, Spado assured the cooperating witness:

> The situation looks very good.  It's gonna
> happen.  It's just not happening within the
> timing that we hoped it would happen. . . .
> [J]ust waiting for everybody to get back in
> from Mexico and, you know they're, re,
> re-supplying uh, the place that they gotta
> re-supply out here.

15

## Analysis

I.  **Legal Standard**

    A.  **Bail Reform Act**

Under the Bail Reform Act, 18 U.S.C. § 3141 <u>et</u> <u>seq</u>., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  <u>See</u> 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence. <u>See</u> <u>Ferranti</u>, 66 F.3d at 542; <u>United States v. Chimurenga</u>, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight must be supported by a preponderance of the evidence.  <u>See</u> <u>United States v. Jackson</u>, 823 F.2d 4, 5 (2d Cir. 1987); <u>Chimurenga</u>, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt.  <u>See</u> 18 U.S.C. § 3142(g).

16

### B.     <u>Organized Crime Defendants</u>

Courts in this circuit routinely have faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses.  <u>See</u>, <u>e.g.</u>, <u>United States v. Cirillo</u>, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, detained as dangers to the community), <u>aff'd</u>, 149 Fed. Appx. 40 (2d Cir. 2005); <u>United States v. Gotti</u>, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), <u>aff'd</u>, <u>United States v. Ciccone</u>, 312 F.3d 535, 543 (2d Cir. 2002); <u>United States v. Agnello</u>, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain Carmine Agnello detained as danger to the community); <u>United States v. Defede</u>, 7 F. Supp. 2d 390, 395-96 (S.D.N.Y. 1998) (Luchese family acting boss Joseph Defede detained as danger to the community); <u>United States v. Salerno</u>, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese acting boss and captain detained as danger to the community), <u>order vacated</u>, 794 F.2d 64 (2d Cir.), <u>order reinstated</u>, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand, at the very least, for the following propositions:  (1) leaders of a violent organized criminal enterprise are dangerous due to their position of authority in that enterprise; (2) organized crime defendants

often constitute dangers to the community due to the high
likelihood that they will continue to commit crimes if released
on bail; and (3) elaborate bail packages involving home detention
and electronic monitoring are insufficient safeguards to protect
the community against dangerous organized crime defendants.

### 1. Organized Crime Leaders Are Dangers to the Community

Pretrial detention is warranted where defendants,
charged with violent crimes, are leaders or high-ranking members
of a criminal organization whose activities routinely include
violence and threats of violence.  See Ciccone, 312 F.3d at 543;
United States v. Colombo, 777 F.2d 96, 99-100 (2d Cir. 1985);
United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y.
1996).  Courts in this circuit have recognized that when
organized crime depends on a pattern of violent conduct of the
sort charged in this case, the risk to the community is
substantial and justifies detention.

For example, in Defede, Joseph Defede was charged with
extortion and extortion conspiracy.  The district court ordered
Defede's pretrial detention, finding that the government had
shown by clear and convincing evidence that Defede was the acting
boss of the Luchese family, thus rendering him a danger to public
safety:  "The acting boss of the Luchese family supervises all of
its far-flung criminal activities, including acts of violence.

18

Defede's continued liberty therefore presents a substantial danger to the public . . . ." <u>Defede</u>, 7 F. Supp. 2d at 395.

More recently, a court in this District denied bail to the acting boss of the Genovese family who "participated at the highest levels in directing an organization alleged in the indictment to be committed to acts of violence to perpetuate its activities and insulate itself from detection by law enforcement," <u>Cirillo</u>, slip. op. at 7, as well as a former acting boss who "is at the highest levels of the Genovese family, participating in highly secret induction ceremonies and sit-downs, and representing the family in important meetings," <u>id.</u> at 11.  The Second Circuit affirmed those findings by summary order. <u>See</u> 149 Fed. Appx. at 43 (2d Cir. 2005) ("This court has affirmed the detention of the leaders of organized crime enterprises on the ground that their continued liberty presents a risk to the public not only from their own violent activities but from those of subordinates whom they supervise.") (citing <u>Ciccone</u>, 312 F.3d at 543).

In addition, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization.  <u>Ciccone</u>, 312 F.3d at 542-43; <u>see also</u> <u>Ferranti</u>, 66 F.3d at 543 (noting that the defendant need not have committed the violence himself; he

19

can be deemed dangerous if he directed others to commit acts of violence) (citing Colombo, 777 F.2d at 98).  As one court has pointed out, an organized crime leader "is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release."  Gotti, 219 F. Supp. 2d at 299-300 (citations omitted).

        To be sure, courts' decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence as a result of their position in a criminal enterprise.  As the court held in Defede:

> it is well established that persons who hold
> Defede's status routinely engage in conduct
> that is a menace to public safety.  The
> argument thus is based not on the status, but
> on the inference that a person in Defede's
> position is quite likely to engage in
> dangerous conduct – just as one reasonably
> could infer that one holding the position of
> major league baseball pitcher is entirely
> likely to hurl a small white object in the
> direction of home plate.

7 F. Supp. 2d at 392 n.4.

        Moreover, in enacting the Bail Reform Act, Congress recognized that certain defendants, such as high-ranking members of an organized crime family fall within a "'small but

identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community.'" <u>Colombo</u>, 777 F.2d at 99 (quoting S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, <u>as</u> <u>reprinted</u> <u>in</u> 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3188-89).

Nor is the above caselaw narrowly limited to organized crime "bosses" or "acting bosses."  In <u>Salerno</u>, 631 F. Supp. at 1374-75, the court held that a defendant would be a danger to the community if released on bail based on evidence that he was a captain in an organized crime family who managed the enforcement operations of the enterprise.  In <u>Colombo</u>, 777 F.2d at 99-100, a captain of a crew in the Colombo family was ordered detained because the operation of that organization posed a risk to the public and a danger to the community by its "consistent pattern of orchestrating a series of violent criminal operations." (internal quotation marks omitted).

### 2.    Organized Crime Defendants Are Likely to Commit Crimes if Released on Bail

Organized crime defendants pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities.  At bottom, because organized crime defendants are career criminals who belong to an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail.  <u>See Salerno</u>, 631

21

F. Supp. at 1375 (finding that the illegal businesses of organized crime require constant attention and protection, and recognizing a strong incentive on the part of its leadership to continue business as usual).

In addition, defendants pose a danger to the community not only when they commit acts of violence, but when it is likely that they will commit even non-violent crimes that are detrimental to the community. See Senate Report at 3195 ("language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."). In Colombo, the court held "[i]n light of Congress' direction that '[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate.'" 777 F.2d at 99 (quoting Senate Report at 3189). In Salerno, the court upheld the detention of two leaders of the Genovese organized crime family, noting:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions. The illegal businesses, in place for many years, require constant attention and protection, or they will fail. Under these circumstances, this court recognizes a

22

> strong incentive on the part of its
> leadership to continue business as usual.
> When business as usual involves threats,
> beatings, and murder, the present danger such
> people pose in the community is self evident.

631 F. Supp. at 1375.

### 3. Elaborate Bail Packages Are Insufficient to Protect the Community Against Violent Organized Crime Defendants

Finally, the Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants, including leaders of organized crime families shown to be involved in violent criminal activities. See United States v. Dono, Nos. 07-5333-cr(L), 07-5334-cr(CON), 2008 WL 1813237, at *2-3 (2d Cir. April 23, 2008) (rejecting conditions that included, among others, home detention and electronic monitoring, and a requirement that the defendant's father – a retired police officer – take "personal responsibility" for the defendant); Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million bail secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring); Colombo, 777 F.2d at 97, 100 (rejecting, among other conditions of release, $500,000 bail secured by real property).

The Second Circuit has viewed home detention and electronic monitoring as insufficient to protect the community

23

against dangerous individuals.  In <u>United States v. Millan</u>, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills.  If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (internal citations and quotation marks omitted).  <u>See</u> <u>also</u> <u>Orena</u>, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal citation and quotation marks omitted).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  <u>See</u>, <u>e.g.</u>, <u>Dono</u>, 2008 WL 1813237, at *2-3 (noting that the idea that "'specified conditions of bail protect the public more than detention is flawed'") (quoting <u>Orena</u>, 986 F.2d at 632); <u>United States v. Cantarella</u>, No. 02-CR-307 (NGG), 2002 WL 31946862 at *3-4 (E.D.N.Y. 2002) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); <u>Agnello</u>, 101 F. Supp. 2d at 116 (Gershon, J.) ("the

24

protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

## II.  The Defendants Should Be Detained

### A.  The Defendants Are a Danger to the Community

Defendants Gioeli, Calabro, Catapano, Competiello, Capolino, DiGorga, and Spado pose a substantial danger to the community.  Each defendant is affiliated with a violent criminal enterprise, and has engaged in violence, planned violence, possessed firearms for the purpose of engaging in violence, or threatened violence.  As discussed more specifically below, each of the relevant considerations under the Bail Reform Act strongly favors detention here.

#### 1.  Nature and Circumstances of the Crimes Charged

First, each of the defendants is charged with crimes of violence under the relevant provisions of the Bail Reform Act. See Ciccione, 312 F.3d at 542 (citing 18 U.S.C. §§ 3156(a)(4)(A),

(B)) (Bail Reform Act defines a "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another," or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"); <u>Chimurenga</u>, 760 F.2d at 404 (conspiracy to commit a crime of violence is a crime of violence for purposes of the Bail Reform Act).

Specifically, defendants Gioeli, Calabro and Competiello are charged with, <u>inter alia</u>, murders, as well as with a violent robbery.  In addition, Gioeli is charged with extortion conspiracy.  Defendants Catapano, Capolino and DiGorga are charged with, <u>inter alia</u>, engaging in extortion, conspiring to commit extortion, and/or loansharking.  Defendant Spado is charged with, <u>inter alia</u>, conspiring to rob a drug dealer and with using a firearm in connection with that robbery.

Furthermore, the charges against Spado and Catapano – conspiracy to distribute cocaine (Spado and Catapano) and use of a firearm in connection with a robbery (Spado) – carry a statutory presumption against bail.  <u>See</u> 18 U.S.C. § 3142(e). The rebuttable presumption shifts the burden of production to the defendant.  <u>See</u> <u>Martir</u>, 782 F.2d at 1144.  Moreover, even if the defendant satisfies this burden, the court should continue to

26

give some weight to the presumption, "keeping in mind that Congress has found that these offenders pose special risks" and that "a strong probability arises that no form of conditional release" will adequately protect the community.  Id. (applying standard with regard to the presumption of flight) (citation omitted and internal quotation omitted).

### 2.   History and Characteristics of the Defendants

The defendants' history and "characteristics" also clearly favor detention.

#### a.   Thomas Gioeli

As noted above, defendant Gioeli is currently the acting boss or "street boss" of the Colombo family, a violent criminal enterprise, and is charged with three murders, a violent robbery and extortion conspiracy, which constitute crimes of violence.  Gioeli has prior convictions for both robbery and attempted robbery.

#### b.   Dino Calabro

Defendant Calabro, a captain in the Colombo family, is charged with murder, murder conspiracy and felony murder, as well as a violent robbery, all crimes of violence.  Calabro is a permanent resident of the United States and not a citizen. Additionally, Calabro has prior convictions for, among other crimes, assault with the intent to cause serious physical injury and attempted burglary.

27

### c. __Michael Catapano__

Defendant Catapano is a captain in the Colombo family. Among other crimes, he is charged with extortion conspiracy and collecting an extortionate loan, each of which constitutes crimes of violence.  As noted above, Catapano has been captured during recorded conversations discussing using violence and intimidation to further his illegal goals.  In a March 2005 recording, Catapano stated, "[e]ven after we get fifty percent of the place and our money, give him a fucking beating anyway."  In another recorded conversation, Catapano discussed his disdain for a number of people in defendant Franzese's crew and that he thought those people should be killed: "Me personally, I would have clipped five, six guys from that crew . . . that guy from Staten Island . . . I would [have] clipped the whole crew right there."

Catapano is also charged with narcotics trafficking. He had a prior conviction for driving while intoxicated and at least one bench warrant was issued in connection with his arrest on that charge.

### d. __Joseph Competiello__

Defendant Competiello is a Colombo family soldier.  He is charged with murder and a violent robbery, which constitute crimes of violence.  He has prior convictions for, among other crimes, burglary, robbery, assault with the intent to cause physical injury, and assault with a weapon.  Two past bench

28

warrants have been issued for Competiello; one in connection with his arrest on the assault with a weapon charge, and one in connection with his unlicensed operation of a motor vehicle.

### e. <u>John Capolino</u>

John Capolino is an associate of the Colombo family. He is charged with extortionate extension of credit, a crime of violence. As referenced above in the proffered facts, Capolino has indicated a willingness to resort to violence, including the use of deadly weapons. In addition to the recorded conversation referred to above, Capolino was recorded discussing violence on other occasions. During a recorded conversation in June 2005, Capolino stated that he wanted to kill someone associated with the Bonanno family who had referred to the family of defendant Franzese (to whom Capolino is related) as "rats." On the recording, Capolino discussed an earlier conversation he had with defendant Catapano and another individual about his desires: "That fucking piece of shit . . . I went to them . . . and told them I wanna fucking kill this kid . . . let me go after this kid, shoot this     kid. . . . I'm gonna get this mother fucker." Later in the conversation, Capolino described chasing another man with a gun: "I went after him with a fucking rifle . . . he ran like a fucking mother fucker."

Capolino also has a prior felony conviction for attempted possession of a forged instrument.

29

### f.   <u>Joseph DiGorga</u>

Joseph DiGorga is an associate of the Colombo family. He is charged with extortion and extortion conspiracy, which constitute crimes of violence.  As noted above, DiGorga is captured discussing his threats of violence during recorded conversations.  Referring to his and Catapano's extortion of Cujini Due Pizzeria during a conversation in August 2005, DiGorga stated, "I got him [defendant Giangrande] that joint, we went in there, we went into that other guy's beauty parlor and his fucking . . . mother fainted."  During that same recorded conversation, DiGorga discussed the protection money that Giangrande owed to defendant Franzese, and said, "he [Giangrande] better hope nothing happens to him [Franzese] because the day it happens to him I'm putting the motherfucker [Giangrande] in the ground."

DiGorga has prior convictions for fraud, possession of a forged instrument, as well as petit larceny.  Five bench warrants have been issued against DiGorga in the past, in connection with the larceny charges.

### g.   <u>Orlando Spado</u>

Orlando Spado is an associate of the Colombo family. He is charged with conspiring to rob a drug dealer, the use of a firearm in connection with that robbery, both crimes of violence, as well as narcotics trafficking.  Spado has been convicted in

the past for multiple controlled substance offenses, among other
crimes.  Two bench warrants have been issued against Spado in the
past.

### 3.    Seriousness of Danger Posed by the Defendants' Release

The seriousness of the danger posed by the defendants'
release cannot be underestimated in light of their affiliation
with the Colombo family, a violent criminal enterprise, and their
involvement in crimes of violence and/or possession of weapons.
As noted above, courts in this circuit have recognized that when
organized crime defendants, such as the defendants in this case,
are charged with employing violent conduct, the risk of continued
violent conduct is substantial and justifies detention.  See
Salerno, 631 F. Supp. at 1364.

Moreover, a defendant poses a danger to the community
not only when he commits acts of violence, but when he is likely
to commit non-violent crimes that harm the community.  Here,
beyond the crimes of violence described above, several of the
defendants are charged with engaging in other crimes that are a
detriment to the community, including narcotics distribution.

### 4.    Evidence of the Defendants' Guilt

As discussed above, the evidence of the defendants'
guilt is exceedingly strong.  The government intends to prove the
defendants' guilt at trial through the testimony of numerous

31

witnesses, included cooperating witnesses, many of whom were once the defendants' co-conspirators.  In addition, the defendants were intercepted on wiretaps and consensual recordings discussing charged crimes.  Physical and documentary evidence, such as phone records, underscore the defendants' guilt.

*          *          *

In sum, in considering each of four relevant "detention" factors, the aforementioned defendants are a danger to the community and should be detained.

**B.    The Defendants Constitute a Risk of Flight**

The aforementioned defendants also constitute a risk of flight.  On the current charges, each defendant faces significant jail time, as detailed below:

| | |
|---|---|
| Thomas Gioeli | Up to life imprisonment |
| Dino Calabro | Up to life imprisonment |
| Michael Catapano | Up to forty years' imprisonment |
| Joseph Competiello | Up to life imprisonment |
| John Capolino | Up to twenty years' imprisonment |
| Joseph DiGorga | Up to twenty years' imprisonment |
| Orlando Spado | Up to life imprisonment |

The significant sentences faced by these defendants give them a substantial incentive to flee.  See United States v.

32

<u>Dodge</u>, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

Moreover, defendants Gioeli, Calabro and Competiello each have used false identification in the past to evade law enforcement.  Gioeli and Calabro used false identification documents to travel throughout the United States without fear of surveillance by law enforcement.  Specifically, on or about August 11, 1998, after law enforcement was advised by a confidential informant that Gioeli and Calabro were scheduled to return from West Palm Beach on that day, law enforcement observed Gioeli and Calabro exit a specific airline arrival terminal together.  However, a review of the flight manifest for the flight that had just arrived from West Palm Beach revealed neither a Gioeli or Calabro aboard the flight.  Along similar lines, Competiello obtained a fraudulent New Jersey driver's license in a false name, which he used for multiple purposes, including to visit a federal prison.

Furthermore, defendants Catapano, Competiello, DiGorga and Spado have a history of bench warrants.

33

## Conclusion

For the reasons cited above, the government respectfully requests that the Court enter permanent orders of detention with respect to defendants Thomas Gioeli, Dino Calabro, Michael Catapano, Joseph Competiello, John Capolino, Joseph DiGorga, and Orlando Spado.

Dated:     Brooklyn, New York
           June 4, 2008

                              Respectfully submitted,

                              BENTON J. CAMPBELL
                              United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York  11201

Elizabeth A. Geddes
James D. Gatta
Assistant United States Attorneys
     (Of Counsel)

34